William O. Wagstaff III – 041322009
The Wagstaff Firm, P.C.
*Attorneys for Plaintiff*
75 South Broadway Suite 400
White Plains, New York 10601
(914) 226-3300
william@wagstaff.legal

Neal Wiesner - 007942004
Wiesner Law Firm, P.C.
*Attorneys for Plaintiff*
34 East 23rd Street - 6th Floor
New York, New York 10010
(212) 732-2225
nwiesner@wiesnerfirm.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

------------------------------------

**MAURICE GORDON, SR. et al.,**

                        **Plaintiffs,**

     **-against-**


**RANDALL WETZEL, et al.,**

                        **Defendants.**

------------------------------------


---

Plaintiffs' Brief in Opposition To Motion To State
Defendants' Motion To Dismiss

---

**TABLE OF CONTENTS**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . i

Preliminary Statement . . . . . . . . . . . . . . . . . . . 1

Comment On Defendants' Statement of Facts . . . . . . . . . . 3

Argument

**Supervisory Liability Is Sufficiently Pleaded And Present**
(Responding to Defendants' Point I) . . . . . . . . . . . . . 5

**The Supervisory Defendants Are Not Entitled To Qualified Immunity**
(Responding to Defendants' Point II). . . . . . . . . . . . . .

**Standing For Injunctive Relief**
(Responding to Defendants' Point III) . . . . . . . . . . . 21

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . 22

## Table of Authorities

<u>**Cases**</u>

<u>Alvarado v. Litscher</u>,
  267 F.3d 648 (7th Circuit 2001) . . . . . . . . . . . . . 15

<u>Antonelli v New Jersey</u>,
  419 F.3d 267 (3rd Cir. 2005) . . . . . . . . . . . . . . 10

<u>Aschcroft v. al-Kidd</u>,
  563 U.S. 731 (2011) . . . . . . . . . . . . . . . . . . 15

<u>Beck v. City of Pittsburgh</u>,
  89 F.3d 966 (3rd Cir. 1996) . . . . . . . . . . . . . . 19

<u>Cacciatore v. City of Phila.</u>,
  2005 WL 2139876 (EDPA 2005) . . . . . . . . . . . . . . 21

<u>Carswell v. Borough of Homestead</u>,
  381 F.3d 235 (3rd Cir 2004) . . . . . . . . . . . . . . 21

<u>Dean for and on Behalf of Harkness v. McKinney</u>,
  976 F.3d 407 (4th Cir. 2020) . . . . . . . . . . . . . . 20

<u>Dover v British Airways PLC</u>,
  2014 WL 317845 (EDNY 2014). . . . . . . . . . . . . . . . 5

<u>Gelboim v Bank of America Corporation</u>,
  823 F3d 759 (2nd Cir 2016) . . . . . . . . . . . . . . . 5

<u>Goodman v Lukens Steel Co.</u>,
  777 F.2d 113, <u>affirmed</u>, 482 U.S. 656 (1987) . . . . . . . 11

<u>In Re: London Silver Fixing, Ltd., Antitrust Litigation</u>,
  213 F.Supp.3d 530 (EDNY 2016) . . . . . . . . . . . . . . 5

<u>In Re: The Mannkind Securities Actions</u>,
  835 F.Supp.2d 797 (USDC CA 2011). . . . . . . . . . . . . 6

<u>In Re NAHC, Inc. Sec. Litig.</u>,
  306 F.3d 1314 (3rd Cir. 2002) . . . . . . . . . . . . . 4

<u>Ieradi v. Mylan Labs, Inc.</u>,
  230 F.3d 594 (3rd Cir. 2000) . . . . . . . . . . . . . . 4

Martinez v. Vill of Mount Prospect,
  92 F.Supp.2d 780 (N.D.Ill. 2000). . . . . . . . . . . . . . . . 19

Pension Ben. Guar. Corp.
  (998 F.2d 1192 (3rd Cir. 1993) . . . . . . . . . . . . . . . 4

Rode v. Dellarciprete,
  845 F.2d 1195 (3d Cir. 1988). . . . . . . . . . . . . . . . 17

Sample v Diecks,
  885 F.2d 1099 (3rd Cir. 1989) . . . . . . . . . . . . . . 11

State v. Soto,
  324 N.J.Super. 66 (Law Div.1996). . . . . . . . . . . . . . 18

Taylor v. Barkes,
  575 U.S. 822 (2015) . . . . . . . . . . . . . . . . . . . . 18

T.E. v Grindle,
  599 F.3d 583 (7th Cir. 2010) . . . . . . . . . . . . . . . 11

Terebesi v Torreso,
  764 F3d 217 (2nd Cir. 2014) . . . . . . . . . . . . . . . 15

United States v State of New Jersey,
  3:99-cv-05970-MLC-JJH, ECF no. 5 (D.N.J. 1999). . . . . . . 18

White v Williams,
  179 F.Supp.2d 405 (NJDC 2002) . . . . . . . . . . . . . . . 14

Whren v United States,
  517 U.S. 806 (1996) . . . . . . . . . . . . . . . . . . . . 19

Williamson v. Stirling,
  912 F.3d 154 (4th Cir. 2018) . . . . . . . . . . . . . . . 20

Wong v. U.S.,
  373 F.3d 952 (9th Cir. 2004) . . . . . . . . . . . . . . . 15

Ziglar v. Abassi,
  ___ US ___, 137 S.Ct. 1843 (2017) . . . . . . . . . . . . . 14

**Acts**

Law Enforcement Professional Standards Act of 2009. . . . . . . 8


**<u>Reports</u>**

<u>Sixth Periodic Report on Law Enforcement Professional Standards</u>
State of New Jersey, Office of the State Comptroller (May 14,
2020. . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

**Preliminary Statement**

This brief is submitted in opposition to the brief of defendants Grewal and Callahan ("the State defendants") seeking dismissal of plaintiffs' causes of action against them.

In their preliminary statement, the State defendants unilaterally pronounce the "heart of this case" to be whether defendant State Police Sergeant Randall Wetzel used excessive force when he shot Maurice Gordon, Jr.

To be sure, 18 months ago, Maurice Gordon, a 28 year old unarmed black male who carried a bible in his car and had no criminal record, was shot by defendant Wetzel six times during a traffic stop. After shooting and cuffing him while he laid dying, Wetzel offered no first aid. Indeed, no first aid was offered until more than 17 minutes later when other officers arrived.

Nevertheless, the "heart" of this case may be conceived as being whether the color of a person's skin can, Constitutionally, be a factor subjecting an individual to a substantially disproportionate risk of harm by State actors.

Perhaps more properly, the "heart" of this case may be conceived to be whether a State officer, knowing that his charges will disproportionally inflict harm upon citizens because of their skin color, can allow his charges to inflict such harm.

With respect to the State defendants, putting it graphically, albeit figuratively, plaintiffs allege that the statistics and

factual data demonstrate that historically in the State of New Jersey, premised upon the same measure of purported provocation (e.g., defiant words, physical resistence, etc.), Martin Luther King would have been more than three times more likely to have been subject to the use of force by the State Police than Charles Manson. Plaintiffs allege that the statistics and facts further demonstrate that, during time pertinent to the Gordon shooting, Dr. King would have been more than eight times more likely than Mr. Manson to have suffered the use of force by the State Police.

Plaintiffs contend the State defendants knew this - which they have not denied and perhaps have obliquely admitted. We believe by their own admissions, if they did not know this, there was deliberateness in that. Indeed, as discussed within, there is evidence from the State Comptroller's Office that defendants actively *hid* these facts.

And, in response to this disproportionate brutality, which in this case left Maurice Gordon, Jr. lying dead on the side of the road, plaintiffs contend the State defendants did nothing or, at best, nothing in any meaningful sense.

Defendants appear to argue that even if their subordinates used force against black people at a rate more than six as against others, or more than eight times more often than as against their white counterparts, they were free to allow their subordinates to

2

go out into the streets and highways of this State to do just that.

It is submitted that if force by State actors were being used in such disproportion against Jews, or women, or Sikhs or gays, action would have been taken, as well it should have been.

As it stands, a 28 year old young man without a criminal history and with a bible in his car, known to his shooter at the time of the shooting to be unarmed, is dead.  The defendants appear to argue that if that was more than six or eight times more likely to be his fate at the hands of those they supervise because of his skin color, that is not their responsibility.

For the reasons set forth below, it is respectfully submitted that defendants' motion to dismiss should be denied.

### Comment On Defendants' Statement of Facts

The State Defendants' Statement of Facts, centering on curated allegations regarding the interactions between Maurice Gordon Jr and defendant Wetzel, is largely impertinent to their motion and, accordingly, will not be dissected here.

As non-exhaustive examples of this curation, in appearing to try to couch Wetzel's actions as restrained and within reason, they omit the fact that Wetzel issued incomprehensible commands, for instance, commanding Gordon to get out of the car when he was 20 feet away from it (Am. Comp. ¶ 55).  In fact, he issued this

command - which it was impossible for Maurice Junior to obey - eight times as he grappled with him (Exhibit A[1]).   Nor do they mention that at no time did he command him to get down on the ground, put his hands up, freeze or tell Maurice Junior - the young man he was to shoot six times - that he was under arrest (¶ 58).

Indeed, although irrelevant to their motion, the State defendants, who claim impartiality in bringing the matter of this shooting before a Grand Jury, make offensive characterizations of both plaintiffs' complaint and the facts.   For instance, contrary to what is stated in the complaint, they say " * * * Gordon again went back towards the trooper's vehicle and entered the front seat, causing Wetzel to wrestle with Gordon" (DB, p 5).

It is neither plaintiffs' position in his complaint nor plaintiffs' belief that Maurice Junior's effort to escape a man who had not placed him under arrest, had physically engaged him, who had failed to issue lawful or even comprehensible commands, and would ultimately shoot him six times and leave him dying on the

---

[1]As defendants point out, in deciding a motion to dismiss this Court may consider matters of public record, published reports of administrative bodies and any publicly available records where accuracy cannot reasonably be questioned citing Pension Ben. Guar. Corp. (998 F.2d 1192, 1997 [3rd Cir. 1993]), In re NAHC, Inc. Sec. Litig. (306 F.3d 1314, 1331 [3rd Cir. 2002]), and Ieradi v. Mylan Labs, Inc. (230 F.3d 594, 598 n.2 [3rd Cir. 2000]).   Exhibit A, extracted from material published by the State defendants on the internet, falls within such materials.

side of the road in handcuffs without even a gesture towards first
aid should have *caused* Wetzel to wrestle with him further.  Indeed,
had Wetzel only allowed Maurice Junior to flee, he would be alive
today.  But he did not.

The fact that plaintiffs do not engage in a pointless exegesis
of defendants' factual exposition should not be taken to infer
their adoption of any portion of it.


## Argument

### Supervisory Liability Is Sufficiently Pleaded And Present

(Responding to Defendants' Point I)

As set forth in the accompanying sworn report of John
Lambreth, Ph.D., using the defendants' own publicly available
figures pertaining to the period of 2012 to 2016, relative to all
others, a black person was more than three times more likely to
have force used against him by the State Police during that
period.[2]

---

[2]Although the Courts have not been uniform in concluding that
an expert's report may be used on a motion to dismiss, we believe
that where, as here, defendants have argued the reliability of
data, and an analysis of its meaning is beyond the ken of ordinary
persons, an expert's analysis is properly considered (see, Gelboim
v Bank of America Corporation, 823 F3d 759, FN 20 [2nd Cir 2016]
expert's probability analysis considered]; In Re: London Silver
Fixing, Ltd., Antitrust Litigation, 213 F.Supp.3d 530, 563 [EDNY
2016] [experts' analyses are factual assertions at pleading
stage]); Dover v British Airways PLC, 2014 WL 317845, *2 [EDNY

The next period for which data is publicly available in this pre-discovery stage commences in October of 2020, five months after Maurice Junior was shot.  From that time, a black person was more than six times - *more than six times* - more likely to have force used against him by the State Police than all others, and more than *eight* times more likely to have force used against him as opposed to a white person.[3]

The State defendants can hardly deny knowledge of this.

Indeed, in taking issue with plaintiffs' assertion that defendant Grewal, in a public statement, conceded he did not "engage in rigorous oversight and analyses of the State Police's actions, training, and internal investigations in an effort to ensure that members of State Police do not engage in racially motivated policing" as he asserted, they said in response:

> Thus, Plaintiffs' assertion in the Amended Complaint that "Grewal has conceded that his office did not do this" (i.e., monitor and analyze uses of force particularly in

---

2014 unreported] [at certain level of particularity, statistical analysis not a conclusory assertion; it is factual allegation that the Court must credit]); In Re: The Mannkind Securities Actions, 835 F.Supp.2d 797, 821 [USDC CA 2011] [experts' reports attached to pleadings buttress plaintiffs' contentions]).

[3]Erring on the side of conservatism, plaintiffs' complaint alleges the racial disparity in use of force by State Police is more than three times greater (Am. Comp. §§68, 88) and "three times" greater (*id.* §§ 69, 71).  It was unknown at the time of drafting that it appears to have grown to more nearly six times greater as against all others around the time Maurice Junior was shot - eight times greater as opposed to a white person.

> relation to racial statistics) is inaccurate as to the
> New Jersey State Police, and in fact he stated the
> opposite from what Plaintiffs allege. (See Am. Compl. ¶
> 77). That assertion made in the Amended Complaint also
> flies in the face of reality because the Office of the
> Attorney General in fact <u>conducts extensive statistical</u>
> <u>analysis of all State Police activity as it relates to</u>
> <u>the race of the subjects of that activity — including</u>
> <u>uses of force — and publishes detailed reports of that</u>
> <u>analysis for anyone in the general public who wishes to</u>
> <u>review them</u>.[4]

(DB,[5] p 19 [footnote omitted] [emphasis added])

Thus, with the State defendants making no claim of falsity with respect to plaintiffs' claims of racially disparate treatment, if the State defendants are to be believed, they *knew* of the six or eight to one racial disparity in the use of force around the time of Maurice Junior's killing.  And they allowed it. Indeed, as set forth below, they hid it.

It is against that factual backdrop that the State Defendants move to dismiss.

These defendants claim plaintiffs "merely pled accusations in the form of legal conclusions" (DB, p 1).  But racially disproportionate use of force is not a legal conclusion; it is a mathematical or statistical conclusion, and here, a factual one. Accepting *arguendo* that State Police were using force against

---

[4]The accuracy of this assertion is addressed below.

[5]References to "DB" are to defendants' brief in support of their motion (Docket No. 36-1).

blacks at a rate more than six or eight times as against others in response to the same precipitating conduct, it is hard to comprehend how the State defendants can claim there are no "actual facts which show deficiencies" in their policies and practices. (*id.*).

Indeed, it is nearly impossible for plaintiffs to believe that by pleading a more than a three to one racial disparity in the use of force - but actually a six to eight to one disparity - the plaintiffs could be considered to have not plead an actual fact which shows deficiencies.

More than three, but apparently in actuality six or eight to one.  That's the actual fact alleged.

Morever, these defendants' arguments that their deliberate indifference to a custom or practice of systemic discrimination "is simply not plausible" (*id.*) because of the statutorily mandated oversight defendant Grewal's Office was required to conduct under the Law Enforcement Professional Standards Act of 2009 ("LEPSA") is a *non sequitur*.  It does, however, demonstrate their knowledge of the systemic discriminatory behavior plaintiffs have alleged, or their indifference to that knowledge unless they come forth to contest the disparity alleged which they have not done.  It does not extricate them from it.

Notwithstanding, defendants still claim "the Amended Complaint

8

fails to plead any actual facts showing that Supervisory Defendants were aware of such a custom or practice and were deliberately indifferent to it" (DB, p 12).  But setting aside the knowledge of racial disparity that they themselves appear to concede, plaintiffs' amended complaint quotes defendant Grewal as he is confronted with these facts in 2018 (Am. Comp. §§71-78).

As the State defendants point out:

[T]here are two general ways that a supervisor can be held liable. *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316  (3d Cir. 2014), overruled on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042 (2015). First, a supervisor can be liable when with "deliberate indifference to the consequences," he establishes or maintains "a policy, practice, or custom which directly caused [a] constitutional harm." Id. (citing *A.M. Ex Rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).

The State defendants go on to state:

Second, a supervisor may be personally liable if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." Id. (internal citation and quotation marks omitted).

We believe both are present here.

In order to successfully show supervisory liability under based upon an alleged deficient policy, Plaintiffs need to show that a supervisor either establishes or maintains "a policy, practice, or custom which directly caused [a] constitutional harm." Id. at 316 (citing A.M. Ex Rel. J.M.K., 372 F.3d at 586).

(DB, p 10)

9

Here, the policy, practice and custom at the time of the decedent's death was to allow the State Police, armed and under color of law, to go out on the streets and highways of this State where they would administer force to black people at more than six times the rate of all others.  And defendants appear to claim, they allowed this knowingly.

The State defendants, apparently claiming they were well versed in, or at least well-positioned to know of, their subordinate's unconstitutional conduct, nevertheless allowed their subordinates, armed and under color of law, to go forth in the community seven days a week, 365 days a year where, around the time of Maurice Junior's death, where they would inflict force on black people more than six times more often as they would against all others.

We believe this is far worse than an "acquiescence" to their subordinates' unconstitutional conduct.  And we believe plaintiffs have pleaded the State defendants' discriminatory intent by alleging:

> 69.  In 2018, NJ.com, collating data on the use of force in New Jersey into a report found, inter alia, that statewide, black people were three times more likely to face force by police than white people.

> 70.  The foregoing was true notwithstanding acts of greater provocation by their white counterparts.

(Am. Comp.)

Intentional discrimination can be shown when a facially neutral law or policy is applied differently on the basis of race (<u>Antonelli v New Jersey</u>, 419 F.3d 267, 274 [3rd Cir. 2005]).

To be sure, discriminatory intent is not required. "When a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm" (<u>T.E. v Grindle</u>, 599 F.3d 583, 591 [7th Cir. 2010]).

Indeed, "racial animus need not be an element in a § 1983 cause of action, nor is there a requirement of intentional conduct or any other particular state of mind as a prerequisite to recovery (<u>Goodman v Lukens Steel Co.</u>, 777 F.2d 113, 135 [3rd Cir. 1985] [citation omitted], <u>affirmed</u>, 482 U.S. 656 [1987]).

"[A] 'person' is not the moving force [behind] the constitutional violation of a subordinate unless that 'person' — whether a natural one or a municipality — has exhibited deliberate indifference to the plight of the person deprived" (<u>Sample v Diecks</u>, 885 F.2d 1099, 1118 [3rd Cir. 1989] [citations and some internal quotations omitted]).

But it gets worse.

Here, there is not only evidence of defendants' acquiescence and indifference to racially disparate conduct in law enforcement

11

by the State Police, there is evidence they hid it.  There is irony
to this in light of the fact that defendants' brief goes on for
several pages hailing their vigilance with respect to racial
disparity issue (DB, pp 14-19).

According to the <u>Sixth Periodic Report on Law Enforcement
Professional Standards</u> (State of New Jersey, Office of the State
Comptroller, May 14, 2020):

> Since at least 2012, OLEPS has recommended to NJSP no
> less than 10 times that a more precise internal or
> external benchmark be developed. NJSP acknowledges that
> it would be preferable to use an external racial/ethic
> benchmark, but has taken no steps to do so. The danger
> involved in using an internal benchmark is that is could
> permit discriminatory conduct to go undetected system-
> wide as long as that conduct occurs consistently within
> NJSP. That is clearly what the external benchmark
> required by the Consent Decree was designed to prevent.
> The absence of an external benchmark may undermine the
> integrity and reliability of the entire enterprise.

(*id.* at 14)

> Defendants admit that:

> The Act also requires that OLEPS prepare and release a
> biannual report that "evaluates the Division of State
> Police's compliance with relevant performance standards
> and procedures and that is comparable" to the reports
> that were issued under the Consent Decree. N.J. Stat.
> Ann. 52:17B-229

(DB, p 16)

And yet, the Office of the New Jersey State Comptroller also
found:

> * * * The Act [LEPSA] requires OLEPS to issue bi-annual

public reports showing aggregate statistics on NJSP
traffic enforcement as well as aggregate data on the race
and ethnicity of the civilians involved [N.J.S.A. 52:17B-
235]. OLEPS is also required to issue bi-annual public
reports that evaluate NJSP's compliance with relevant
performance standards and procedures (Oversight Reports)
[N.J.S.A. 52:17B-229]. OSC's review revealed that there
is a significant delay in the end date of the data being
analyzed and the date the report regarding that time
period is made public. For instance, OLEPS's Fourteenth
Oversight Report, which was issued in February 2019,
analyzed motor vehicle stop data for the time period
January 1, 2016 through June 30, 2016. Similarly, OLEPS
Fifteenth Aggregate Report of Traffic Enforcement
Activities was issued in August 2018, but reviewed and
analyzed data for the period January 2016 to June 2016.
The delays are worsening. As of the issuance of this
report in May of 2020, OLEPS has not issued its Fifteenth
Oversight Report addressing motor vehicle stops during
the second half of 2016.

OLEPS provided OSC with several reasons for these
delays. OLEPS stated that the delay is attributable, in
part, to staffing issues and other projects assigned to
OLEPS by the OAG. OLEPS also advised that the reviews of
draft reports by NJSP and the OAG cause further delays.
OLEPS explained that the fieldwork and analysis for the
Fifteenth through Nineteenth Oversight Reports, which
would cover motor vehicle enforcement activity through
the end of 2018, are complete. The reports, however, are
still in various stages of review and not yet ready for
publication.

(*Id.*, p 22 [emphasis added])

We submit this paints a very different picture than that
painted by defendants. This Court may wish to compare the New
Jersey Comptroller's statements against the defendants and may
weigh which it is inclined to credit.

Indeed, in their initial motion to dismiss before this Court,

defendants stated, *inter alia:*

> * * * State statutory law actually mandates that an
> office within the Office of the Attorney General, OLEPS,
> engage in rigorous oversight and analyses of the State
> Police's actions, training, and internal investigations
> in an effort to ensure that members of State Police do
> not engage in racially motivated policing. As a result,
> Plaintiffs' claims based on the theory that Defendants
> fail to supervise and train the State Police in a manner
> that is constitutionally sufficient should be dismissed
> as well.

(Docket # 19-1, Page 24 of 28 [emphasis added])

It appears defendants' oversight of State Police actions may
not be as "rigorous" as defendants would have this Court believe.

If the statements in the Comptrollers report are true, this
merely demonstrates that defendant Grewal's Office, the State's
highest Law enforcement authority, simply broke the law.

Indeed, we believe that stalling the public issuance of these
reports by the defendants, as identified by the Comptroller's
report, itself demonstrates additional wrongful conduct in hiding
this deplorable data. This is impermissible (White v Williams, 179
F.Supp.2d 405, 419 [NJDC 2002]). Although unknown to plaintiffs at
the time of drawing their second amended complaint, this gives rise
to another factual basis for amendment.

**The Supervisory Defendants Are Not Entitled To Qualified Immunity**
(Responding to Defendants' Point II)

14

"The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions" (Ziglar v. Abassi, ___ US ___, 137 S.Ct. 1843, 1866 [2017] [quoting Aschcroft v. al-Kidd, 563 U.S. 731, 743 [2011]). This results in officials receiving shield from suit unless "[1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." (Terebesi v Torreso, 764 F3d 217, 230 [2nd Cir 2014] [internal quotation and citation omitted]). A right is clearly established when its contours… are sufficiently clear that, at the time of the challenged conduct, "every reasonable official would have understood that what he is doing violates that right" (Ashcroft, 563 U.S. at 741).

However, "while government officials have the right, for well-developed policy reasons, to raise and immediately appeal the qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case (Wong v. U.S., 373 F.3d 952, 957 (9th Circuit 2004 [internal quotations omitted]) Further, "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds (Alvarado v. Litscher, 267 F.3d 648, 652 [7th Circuit 2001] [citing Jacobs v. City of Chicago, 215 F.3d 758, 765 n.3 [7th Cir. 2000]).

Because an immunity defense usually depends on the facts of

15

the case, dismissal at the pleading stage is inappropriate: "The plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity" (*id.*). As noted in the Jacobs' concurrence, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal" (*id.* at 775 (Easterbrook, J., concurring]. [W]hen defendants do assert immunity it is essential to consider facts in addition to those in the complaint" (*id.*).

As an initial matter, the State defendants seem to misapprehend plaintiffs' pleadings by asserting that plaintiffs are suggesting what policy the Attorney General's Office or New Jersey State Police should implement to address the NJSP's discriminatory use of force. But plaintiffs do not plead that there is an established right to the implementation of a particular type of policy.

On the contrary, plaintiffs pled that the failure of the State defendants to address the disparate use of force in an effective way, which they were aware of from the New Jersey Force Report and from the statistical data collected by OLEP, which defendants conceded is required by law, constitutes acquiescence, deliberate indifference, and conspiracy with the bad actors. Accordingly, the NJSP's disparate use of force against Blacks compared to white citizens despite less provocation is and was on May 23, 2020, the

16

*de facto* policy, custom and practice in place in violation of the Fourteenth Amendment.

In 2018, when confronted with the statistics that Black people were at least three times more likely to have force used against them, despite less provocation, then Attorney General Grewal acknowledged "You've obviously highlighted shortcomings in the system, and we're committed to fixing whatever shortcomings there are to ensure we have the best system here in New Jersey to collect this information and review it."

This did not happen.

Aside from the death of Junior almost two years after Grewal conceded the system was broken, the Office of the New Jersey Comptroller - just two weeks before Junior's killing – reported it recommended to the NJSP no less than 10 times that a more precise internal or external racial/ethnic benchmark was needed to prevent discriminatory conduct within the NJSP from going undetected system-wide (Sixth Periodic Report on Law Enforcement Professional Standards [State of New Jersey, Office of the State Comptroller, May 14, 2020], p 14).

A government official can be found liable under Section 1983 if they are personally involved with the alleged constitutional violations (Rode v. Dellarciprete, 845 F.2d 1195, 1207 [3d Cir. 1988]). A defendant's personal involvement can be shown through

17

allegations of personal direction or of actual knowledge and
acquiescence (*id.*).

Grewal and Callahan were deliberately indifferent to the
racially disparate conduct of the NJSP. Even worse, as discussed in
the Comptroller's report *supra* they have apparently hidden the
data.

The State of New Jersey has a well-established history of
issues with racial profiling and disparate treatment of people of
color (*see,* White, 179 F.Supp.2d at 411–416; State v. Soto, 324
N.J.Super. 66, 84, 734 A.2d 350 (Law Div.1996). The breadth of the
illegality resulted in a federal consent decree (United States v.
State of New Jersey, 3:99-cv-05970-MLC-JJH, ECF no. 5 [D.N.J.
December 29, 1999]). It is shocking that defendants would take the
position that there was no "controlling authority" or "robust
consensus of cases of pervasive authority" and its reliance on
Taylor v. Barkes (575 U.S. 822 [2015]) is misplaced.

Taylor dealt with the question of whether the plaintiff had an
established right to the proper implementation of adequate suicide
prevention protocols. Here, plaintiffs have not pled nor or are
they suggesting that a particular policy be implemented. Plaintiffs
allege that defendants' failure to effectively address the
disparity in the use of force by NJSP against Black people, which
defendant Grewal in his own words acknowledged reflected a "broken

18

system" and which was further supported by statistical data collected by OLEP constitutes a *de facto* policy, custom or practice that violates the Fourteenth Amendment.

Similarly, defendants' reliance on <u>Beck v. City of Pittsburgh</u> (89 F.3d 966, 967 [3ʳᵈ Cir. 1996]) is misplaced. In fact, by parity of reasoning, it supports plaintiffs' position that Qualified Immunity should be denied.

In <u>Beck</u> the Court held that the question of whether the policy makers knew about and acquiesced to a custom tolerating tacit use of excessive force by police was a question for the jury.

Here, plaintiffs pled that the policy makers were aware of the disparate use of force by NJSP against Black people supported by data they acknowledged was accurate and that OLEP was required to collect. This acquiescence as pled constituted a custom tolerating the disparate use of force against Black people, which should be a question for a jury, not decided at the pleading stage.

The right to be free from disparate treatment by police based on race is clearly established and where proven amounts to a violation of the Fourteenth Amendment (see, <u>Whren v. United States</u>, 517 U.S. 806, 813 [1996]["The Constitution prohibits selective enforcement of the law based on considerations such as race"]; <u>Illinois v. Wardlow</u>, 528 U.S. 119, 133 n.10 [2000][Discussing then New Jersey Attorney General's pronouncement minority motorists have

19

been treated differently by NJSP than non-minority motorists during traffic stops on the NJ Turnpike. The problem of disparate treatment real, not imagined]; <u>Martinez v. Vill of Mount Prospect</u>, 92 F.Supp.2d 780, 782 [N.D.Ill.2000][Racial profiling of any kind is anathema to system because it eviscerates the core integrity necessary to operate that system in our diverse democracy])

Nevertheless:

> Some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.

(<u>Dean for and on Behalf of Harkness v. McKinney</u>, 976 F.3d 407, 418 4th Cir. 2020] [citing <u>Browder v. City of Albuquerque</u>, 787 F.3d 1076, at 1082-83 [10th Cir. 2015]); <u>see also</u>, <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 [2002] [cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established])

Accordingly, public officials "can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was wrongful" (<u>Williamson v. Stirling</u>, 912 F.3d 154, 187 [4th Cir. 2018]).

Here, plaintiffs plausibly pled that State defendants' acquiescence and deliberate indifference to the ratio of use of force against black people compared to other civilians constituted

a *de facto* policy which violated the Fourteenth Amendment.

Indeed, it was clearly established as of May 23, 2020, that Grewal and Callahan as policy makers could not be deliberately indifferent to the starkly disparate use of force on Black people by NJSP in their charge, especially when it was publicly acknowledged by Grewal and the statistics were available through OLEP. <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 244 (3rd Cir 2004); <u>Cacciatore v. City of Phila</u>*.*, 2005 WL 2139876, *1 – *3 [EDNY 2005] [unreported]). This deliberate indifference was the moving force behind NJSP officers disparate use of force which is the constitutional deprivation that Junior sustained. If the policy makers are ignoring statistical data and even hiding it, that reveals disparate use of force against Blacks, there is no reasonable deterrence that could prevent the widespread custom.

No reasonable official would have thought acquiescence to NJSP officers disparate use of force against Black people at a ratio of at least 3 to 1 as of 2016 (based on the data from the NJ Force Report) and up to 8 to 1 as against white people around the time of Maurice Junior's shooting (based on the most recent publicly available data provided from the NJAG use of force portal) was lawful.

Therefore, State defendants request for qualified immunity should be denied.

## Standing For Injunctive Relief

(Responding to Defendants' Point III)

That State officials would resist being enjoined from allowing constitutional wrongs of the magnitude at issue here, is troubling. Unfortunately from plaintiffs' perspective, plaintiffs know of no principled basis to object to the dismissal of their plea for injunctive relief in response to defendants' Point III.

## Conclusion

For the reasons set forth above, it is respectfully submitted that defendants' motions should be denied except insofar as they seek to dismiss plaintiffs' claim for injunctive relief in the complaint they challenge.

Dated:      New York, New York
            November 1, 2021
                              The Wiesner Law Firm, P.C.


                              /s/Neal Wiesner
                    By:  _____
                              Neal Wiesner
                              34 East 23rd Street – 6th Floor
                              New York, New York 10010
                              (212) 732-2225
                              nwiesner@wiesnerfirm.com

22

The Wagstaff Firm, P.C.


/s/William O. Wagstaff III

By: _____
William O. Wagstaff III
75 South Broadway - Suite 400
White Plains, New York 10601
(914) 226-3300
William@Wagstaff.Legal

23