## Qualifications

I received my B.A. from Austin College, an S.T.B. from Harvard University, and an M.A. and Ph, D. from Purdue University in Personality and Social Psychology. I served on the faculty at Temple University from 1973 until my retirement in 2002, serving as Chair of the Department of Psychology from 1989 until 1995. Between 2000 and 2018 I headed Lamberth Consulting a firm which provided consulting services to police departments, local governments, and civil rights groups. These services include benchmark measurement[1] and assessment of police stop data, training for police and community members, community engagement, and litigation services. I was an expert for the defense in *State v. Soto, et. al.*[2], in which the court credited my benchmarking methodology and measurements, relied on those measurements and my conclusions to find that statistical evidence established a de facto policy of targeting African Americans for investigation and arrest. I also published a peer reviewed paper on the New Jersey State Police (NJSP) stops subsequent to the Soto case.[3] Courts have likewise relied upon my findings in *Wilkins v. Maryland State Police (Civil Action No. CCB-93-483)* and *Maryland State Conf. of NAACP Branches. v. Maryland State Police, et. al (Civil Action No. CCB-98-1098),* cases in the US District Court of Maryland. I have conducted assessment studies of police stops and searches on more than 30 occasions, in both the United States and abroad. Since 2018 I have headed Beyond-Bias, LLC a firm which has developed training which concentrates on implicit and explicit bias against minority groups. For a more complete recitation of my professional experience, publications and education please see my Vita appended to this report.

I was asked by plaintiffs in this case to determine whether there was evidence that the New Jersey State Police (NJSP) used force more frequently on Black motorists than on White motorists. As the case has not entered the discovery phase, I could only rely on publicly available data sources. The two that I used were from the Force Report[4] and the New Jersey Office of the Attorney General's (NJOAG) Force Dashboard.[5] The Force Report was a major undertaking of Advanced Media of New Jersey. While I served as an advisor to the project immediately preceding its publication, I advised on statistical issues and was not privy to their specific findings. I rely for this report on the data contained in *Force.nj.com*. The reasons that I can rely on these data are the fact that the NJAG reacted in the way he did in starting his own efforts to reduce force among police forces in New Jersey and the fact that the data were obtained using FOIA requests. The reason that I rely on the NJOGs data is that in a similar situation subsequent to the decision in the Soto case NJOAG looked at the data from the NJSP and issued a report

---

[1] A benchmark is the standard to which police stop data is compared in measuring whether police are stopping too many motorists of a specific race/ethnicity.
[2] State v. Soto, 324 N.J. Super 66; 734 A.2nd 350 (1996).
[3] Kadane, J.B. & Lamberth. J. Are blacks egregious speeding violators at extraordinary rates in New Jersey? Law, Probability & Risk, 2009.
[4] Force.nj.com  Retrieved 10/29/2021
[5] https://www.njoag.gov/force/ Retrieved 10/29/21.

admitting the trial courts findings and withdrawing the appeal that was entered shortly after the initial decision.[6]

**Findings Expressed**

1. The data from the Force Report from 2012 to 2016 showed that Blacks had forced used on them 3 times a frequently as did non-Blacks
2. The data from NJOAG which covered the year from October 2020 to Sept 2021 showed that Blacks had force used on them 5.6 times as frequently as did non-Blacks.
3. In addition I was able to compute the comparison of White vs Blacks and this comparison showed that Blacks had force used on them 8.1 times as frequently as Whites.
4. The killing of Maurice Gordon occurred in May of 2020, a time between the two data sets available to me. As a statistician I can infer that the data from the NJOAG data is closer to the situation as it existed on May 23, 2020.
5. Probably the most important revelation of my present work is that, even though the NJAG reacted in a manner that indicated he was dissatisfied with the racial disparity in The Force Reports data, the racial disparity actually increased in the data that NJOAG has released from 35.3% to 47.8% of the incidents.

**Data Sources**

There were two data sources that I considered. The first of these was The Force Report published by New Jersey Advanced Media.[7] This is an online site that contains the description of how those data were amassed by Advanced Media of New Jersey providing data on use of force by virtually all police departments in the state from 2012 through 2016. I only used the data from the New Jersey State Police. The second data source was from the New Jersey Office of the Attorney General's Dashboard for use of force from October 2020 through August 31, 2021.[8] This is an online site that provides data on the use of force by all police officers in NJ. I only used the data from the NJSP. This data set is much more germane to the issue at hand, as the data are much closer to Mr. Gordon's shooting: 3 months for the NJOAG as opposed to at least 3-4 years for The Force Report data. I am only using the Force Report data to provide a point of comparison for the NJOAG data. To my knowledge, the New Jersey Attorney General has not made similar data available prior to October, 2020.

Both data sources have issues with them, but they are the best available to me. The Force Report contains data that were collected prior to the date of Mr. Gordon's shooting and while they were amassed at great effort there were certain important pieces of data that were either redacted from

---

[6] Verniero, P. & Zubeck, P. Interim review of the State Police Review Team regarding allegations of racial profiling, 29 April, 1999.
[7] Force.nj.com
[8] Njoag.gov/force

the reports or may have been underreported. The report notes that there was no standard way for Hispanics to be reported and therefore they may be underreported. There is an accepted way to compute the proportion of Hispanics in any list where surnames are available. It is important to use a "surname analysis" to estimate the number of Hispanics who were in the group. The use of surnames to categorize persons as to Hispanic ethnicity is widely accepted, dating back at least to the 1950s. As Perkins (1993) wrote:

> The United States Bureau of the Census has used Spanish surname lists as a method of identifying the Hispanic population for more than 40 years. In 1950, the first Spanish surname list helped indicate the Hispanic population found in Arizona, California, Colorado, New Mexico, and Texas. New Spanish surname lists developed whenever additional significant Spanish surname data became available.[9]

Subsequent research on Hispanic surnames, primarily coming from the United States Census Bureau, has found that Hispanic surnames are an accurate way of determining Hispanic ethnic origin when surnames are available. Probably the most recent in a series of articles relating to this methodology is an undated one by Word, et. al. available at http://www.census.gov/genealogy/www/surnames.pdf. The methodology of determining ethnicity from the surname of an individual has been widely utilized by social science researchers.

It appears that the surnames of those who had force used on them were not reported in the Force Report and there is no listing of surnames in the data on the NJOAG data. Further, the reporting of the data from NJOAG did not begin until slightly over 3 months subsequent to Mr. Gordon's shooting.

There are other deficiencies in the NJOAG data, much of it referring to the timeliness of its reporting. I have considered pertinent points in several New Jersey Office of the Comptroller (NJOC) report but will briefly discuss only one. In the 6th Periodic Report on NJSP's reporting and documenting data the Comptroller notes that the lag in reporting has grown to 3 years and is increasing. This is concerning as "aging" of data is sometime the reason for possible inaccuracies.[10]

---

[9] Perkins, R. Colby (1993), Evaluating the Passel-Word Spanish Surname List. Available online at httpw.census.gov/population/www/documentation/twps0004.html.

[10] Nj.gov/comptroller/news/docs/njsp_6th_report.pdf

**Statistical Analyses**

The statistical analysis that I will employ in this report when comparing use of force on Blacks vs non-Blacks and Blacks vs. Whites is the odds ratio. The odds ratio is best understood by the statement "If you are a Black (Hispanic, female) person, you are ___ times as likely to have force used on you by a police officer than if you are a non-Black (Hispanic, female) person. The theoretical neutral point for the odds ratio is 1.

The odds ratio for the use of force data comparing Black vs non Black from 2012 to 2016 (from the Advanced Media) data is 3.32. When I make the same comparison about 4 years later from the NJOAG data the odds ratio is 5.6. However, these data are confounded by the fact that included in the non-Black category are other minority groups. Therefore I decided to compute the odds ratio for Black vs, White. When I make that comparison the odds ratio is 8.1.

While these odds ratios are important and statistically significant, the most obvious fact to the public is the increase in the proportion of Blacks in the data from the NJOAG compared to the proportion of Blacks in the Force Report data. There was a 12.5% increase in the proportion of Blacks having force used on them by the NJSP between the end of 2016 and October 2020. This difference is highly statistically significant ($z=3.25$, $p<.0007$). Generally researchers find statistical significance occurs when the difference between two proportions reaches the .05 level or 5 times in 100. These data showed that this event would occur by chance less that 7 times in 10,000.

**Discussion**

These data answer two important questions, even though they suffer from the flaws discussed above, and they answer the first question in the affirmative and the second in the negative.

1. Are Blacks more likely to have force used on them than non-Blacks?
2. Did the revelations of The Force Report and the public efforts of the NJAG reduce the racial disparities in the use of force by the NJSP?

These data present a very stark picture for New Jersey. The odds ratios reported above indicate that from at least 2012 the NJSP used force on Black people more than on non-Black and the efforts by the NJAG to reduce the racial disparities seems to have a counterintuitive result, that is, racial disparities have increased.

John Lamberth, Ph.D., pursuant to 28 USC § 1746, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*John Lamberth*

John Lamberth, Ph.D.

Signature: *John Lamberth*
John Lamberth (Nov 1, 2021 16:45 EDT)

Email: jlamberth@beyond-bias.com

# Gordon Lamberth Sworn Statement

Final Audit Report                                                                 2021-11-01

| | |
|---|---|
| Created: | 2021-11-01 |
| By: | William Wagstaff III (william@wagstaff.legal) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAPcP-9u9vomdZ_ksSKp_FbAH3W5CATz4P |

## "Gordon Lamberth Sworn Statement" History

📄 Document created by William Wagstaff III (william@wagstaff.legal)
2021-11-01 - 8:19:35 PM GMT- IP address: 74.108.92.130

✉️ Document emailed to John Lamberth (jlamberth@beyond-bias.com) for signature
2021-11-01 - 8:20:05 PM GMT

📄 Email viewed by John Lamberth (jlamberth@beyond-bias.com)
2021-11-01 - 8:38:47 PM GMT- IP address: 69.139.69.87

✍️ Document e-signed by John Lamberth (jlamberth@beyond-bias.com)
Signature Date: 2021-11-01 - 8:45:24 PM GMT - Time Source: server- IP address: 69.139.69.87

✅ Agreement completed.
2021-11-01 - 8:45:24 PM GMT

Adobe Sign