William O. Wagstaff III — 041322009
The Wagstaff Firm, P.C.
*Attorneys for Plaintiff*
75 South Broadway Suite 400
White Plains, New York 10601
(914) 226-3300
william@wagstaff.legal

Neal Wiesner — 007942004
Wiesner Law Firm, P.C.
*Attorneys for Plaintiff*
34 East 23rd Street — 6th Floor
New York, New York 10010
(212) 732-2225
nwiesner@wiesnerfirm.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

-----------------------------------

**MAURICE GORDON, SR. et al.,**

**Plaintiffs,**

Docket # 21-cv-4861(KMW)(AMD)

-against-

**RANDALL WETZEL, et al.,**

**Defendants.**

-----------------------------------

Plaintiffs' Brief in Opposition To Motion To State
Defendants' Motion To Dismiss

**TABLE OF CONTENTS**

Table of Authorities .......................................... i

Preliminary Statement ........................................ 1

Comment On Defendants' Statement of Facts .................... 5

Argument

**Supervisory Liability Is Sufficiently Pleaded And Present**
(Responding to Defendants' Point I) ........................... 9

**The Supervisory Defendants Are Not Entitled To Qualified Immunity**
(Responding to Defendants' Point II) ......................... 22

**Plaintiffs Have Sufficiently Pled § 1985 & § 1986 Claims)**
(Responding to Defendants' Point III) ........................ 30

Conclusion ................................................... 35

## Table of Authorities

### Cases

Alvarado v. Litscher,
  267 F.3d 648 (7th Circuit 2001) ............................... 23

Antonelli v New Jersey,
  419 F.3d 267 (3rd Cir. 2005) ................................. 18

Aschcroft v. al-Kidd,
  563 U.S. 731 (2011) ......................................... 22

Beck v. City of Pittsburgh,
  89 F.3d 966 (3rd Cir. 1996) ................................. 27

Cacciatore v. City of Phila.,
  2005 WL 2139876 (EDPA 2005) ................................. 29

Carswell v. Borough of Homestead,
  381 F.3d 235 (3rd Cir 2004) ................................. 29

Dean for and on Behalf of Harkness v. McKinney,
  976 F.3d 407 (4th Cir. 2020) ................................ 28

Dover v British Airways PLC,
  2014 WL 317845 (EDNY 2014) .................................. 9

Gelboim v Bank of America Corporation,
  823 F3d 759 (2nd Cir 2016) .................................. 9

Goodman v Lukens Steel Co.,
  777 F.2d 113, affirmed, 482 U.S. 656 (1987) ................ 18

In Re: London Silver Fixing, Ltd., Antitrust Litigation,
  213 F.Supp.3d 530 (EDNY 2016) .............................. 9

In Re: The Mannkind Securities Actions,
  835 F.Supp.2d 797 (USDC CA 2011) ........................... 9

In Re NAHC, Inc. Sec. Litig.,
  306 F.3d 1314 (3rd Cir. 2002) .............................. 6

Ieradi v. Mylan Labs, Inc.,
  230 F.3d 594 (3rd Cir. 2000) ............................... 6

Laboalokie v. Capital Area Intermediate Unit,
926 F.Supp. 503, 508-09 (M.D. Pa. 1996) ................................................30

Lake v. Arnold,
112 F.3d 682, 685 (3d Cir. 1997)................................................................30

Loftus v. SEPTA,
843 F.Supp. 981, 986-87 (E.D.Pa. 1994) ...............................................30

Martinez v. Vill of Mount Prospect,
  92 F.Supp.2d 780 (N.D.Ill. 2000) .............................. 28

Mitchell v. Fuentes,
2013 WL 2253585 (D.N.J. 2013)................................................................32

Novotny v. Great American Federal Savings & Loan Association,
584 F.2d 1235, 1256 - 1260 (3d Cir. 1978) (en banc) ............... 31, 34

Pension Ben. Guar. Corp.
  (998 F.2d 1192 (3rd Cir. 1993) ............................... 6

Rode v. Dellarciprete,
  845 F.2d 1195 (3d Cir. 1988) ............................ 25

Sample v Diecks,
  885 F.2d 1099 (3rd Cir. 1989) ........................... 19

State v. Soto,
  324 N.J.Super. 66 (Law Div.1996) ........................... 26

Taylor v. Barkes,
  575 U.S. 822 (2015) ....................................... 26

T.E. v Grindle,
  599 F.3d 583 (7th Cir. 2010) ............................. 18

Terebesi v Torreso,
  764 F3d 217 (2nd Cir. 2014) .............................. 22

United States v State of New Jersey,
  3:99-cv-05970-MLC-JJH, ECF no. 5 (D.N.J. 1999) ............. 26

White v Williams,
  179 F.Supp.2d 405 (NJDC 2002) ...........................22,32

Whren v United States,
  517 U.S. 806 (1996) .......................................27

Williamson v. Stirling,
     912 F.3d 154 (4th Cir. 2018) ...........................28

Wong v. U.S.,
  373 F.3d 952 (9th Cir. 2004) ..............................23

Ziglar v. Abassi,
  ____ US ___, 137 S.Ct. 1843 (2017) ......................22,32

## Acts

Law Enforcement Professional Standards Act of 2009 ...........14

## Reports

Sixth Periodic Report on Law Enforcement Professional Standards
State of New Jersey, Office of the State Comptroller (May 14,
2020 ...............................................19, 25

iv

**Preliminary Statement**

This brief is submitted in opposition to the brief of defendants Grewal and Callahan ("the State defendants") seeking dismissal of plaintiffs' causes of action against them.

In their preliminary statement, the State defendants unilaterally pronounce the "heart of this case" to be whether defendant State Police Sergeant Randall Wetzel used excessive force when he shot Maurice Gordon, Jr.

To be sure, 22 months ago, Maurice Gordon, a 28 year old unarmed black male who carried a bible in his car and had no criminal record, was shot by defendant Wetzel six times during a traffic stop. After shooting and cuffing him while he laid dying, Wetzel offered no first aid. Indeed, no first aid was offered until more than 17 minutes later when other officers arrived.

Nevertheless, the "heart" of this case may be conceived as being whether the color of a person's skin can, Constitutionally, be a factor subjecting an individual to a substantially disproportionate risk of harm by State actors.

Perhaps more properly, the "heart" of this case may be conceived to be whether State officers, knowing their subordinates will disproportionally inflict harm upon citizens

1

because of their skin color - in a disproportion as large as eight to one - can allow their subordinates to inflict such harm.

Continuing with the State defendants' "heart" metaphor for the moment, a ventricle in this case is whether it is okay for the State defendants to affirmatively hide the racially disproportionate use of force against black people by the New Jersey State Police ("NJSP") to avoid the public outcry to address this race-based violence that exposure would have precipitated.

Indeed, while defendant Grewal's words for public consumption may be politic and strategic, his actions - along with the actions of defendant Callahan - have sent a different message to the NJSP.

In one unusual example, in the transcript of an interview with the Washington Post,[1] discussing an increase in incidents of bias and hate, defendant Grewal said:

---

[1] https://www.washingtonpost.com/washington-post-live/2021/03/01/transcript-race-america-police-reform-with-new-jersey-attorney-general-gurbir-grewal/ (March 1, 2021).

2

And you know, none of this has been a surprise to us as what's contributing to it. Now we've been really raising the alarm over the last three years that it is the president's--former President Trump's rhetoric, hateful rhetoric and the rhetoric of his enablers, that is drawing these folks out of the shadows, that people feel as if this type of conduct is now normalized. So, you've seen it from the campaign of President Trump through his early administration, from Charlottesville all the way to the Capitol and every point in between where his rhetoric has normalized this type of conduct.

In a ceremony in 2017 for which defendant Callahan was present, President Trump was awarded a badge by the NJSP, which defendant Grewal headed, with an Order stating: "The New Jersey State Police 'Roll Call' roster will forever reflect badge number 45 being honorably issued to President Donald J. Trump."

Thus, the man who was decried by defendant Grewal as normalizing hate and bias, was added honorarily to the ranks of the NJSP by defendants.  It is submitted that this may not have communicated to the NJSP the intolerance of hate and bias defendants profess in public.

With respect to the State defendants, putting it graphically, albeit figuratively, plaintiffs allege that the statistics and factual data demonstrate that historically in the State of New Jersey, premised upon the same measure of purported provocation (e.g., defiant words, physical resistance, etc.),

3

Martin Luther King would have been as much as three times more likely to have been subject to the use of force by the State Police than Charles Manson.    Plaintiffs allege that the statistics and facts further demonstrate that, during time pertinent to the Gordon shooting, Dr. King would have been more than eight - *eight* - times more likely than Mr. Manson to have suffered the use of force by the NJSP.

Plaintiffs contend the State defendants knew this - which they have not denied and perhaps have obliquely admitted.   We believe by their own admissions, if they did not know this, there was deliberateness in that.   Indeed, as discussed within, there is evidence from the State Comptroller's Office that defendants actively *hid* these facts.

And, in response to this disproportionate brutality, which in this case left Maurice Gordon, Jr. lying dead on the side of the road, plaintiffs contend the State defendants did nothing or, at best, nothing in any meaningful sense.

Defendants appear to argue that even if their subordinates used force against black people at a rate nearly six times that as against others, or more than eight times more often than as against their white counterparts, they were free to allow their subordinates to go out into the streets and highways of this

4

State to do just that.

It is submitted that if force by State actors were being used in such disproportion against Jews, or women, or Sikhs, or gays, action would have been taken, as well it should have been. The proposition that we are all equal in rights is integral to our Constitution.

As it stands, a 28 year old young man without a criminal history and with a bible in his car, known to his shooter at the time of the shooting to be unarmed, is dead.  The defendants appear to argue that if that was more than six or eight times more likely to be his fate at the hands of those, they supervise because of his skin color, that is not their responsibility.

For the reasons set forth below, it is respectfully submitted that defendants' motion to dismiss should be denied.

## Comment On Defendants' Statement of Facts

The State Defendants' Statement of Facts, centering on curated allegations regarding the interactions between Maurice Gordon Jr. and defendant Wetzel, is largely impertinent to their motion and, accordingly, will not be dissected here.

As non-exhaustive examples of this curation, in appearing to try to couch Wetzel's actions as restrained and within

5

reason, they omit the fact that Wetzel issued incomprehensible commands, for instance, commanding Gordon to get out of the car when he was 20 feet away from it (Am. Comp. ¶ 55).  In fact, he issued this command - which it was impossible for Maurice Junior to obey - eight times as he grappled with him (Exhibit A[2]).  Nor do they mention that at no time did he command him to get down on the ground, put his hands up, freeze or tell Maurice Junior - the young man he was to shoot six times - that he was under arrest (¶ 58).

To be sure, in the instant iteration of their motion to dismiss, the State defendants, who claim impartiality in bringing the matter of this shooting before a Grand Jury, have

---

[2]As defendants point out, in deciding a motion to dismiss this Court may consider matters of public record, published reports of administrative bodies and any publicly available records where accuracy cannot reasonably be questioned citing <u>Pension Ben. Guar. Corp.</u> (998 F.2d 1192, 1997 [3[rd] Cir. 1993]), <u>In re NAHC, Inc. Sec. Litig.</u> (306 F.3d 1314, 1331 [3[rd] Cir. 2002]), and <u>Ieradi v. Mylan Labs, Inc.</u> (230 F.3d 594, 598 n.2 [3[rd] Cir. 2000]).  Exhibit A, extracted from material published by the State defendants on the internet, falls within such materials.

6

omitted some of their previous offensive characterizations of both plaintiffs' complaint and the facts.   For instance, contrary to what is stated in the complaint, they previously claimed " * * * Gordon again went back towards the trooper's vehicle and entered the front seat, causing Wetzel to wrestle with Gordon" (DB, p 5).

It was neither plaintiffs' position in his complaint nor plaintiffs' belief that Maurice Junior's effort to escape a man who had not placed him under arrest, had physically engaged him, who had failed to issue lawful or even comprehensible commands, and would ultimately shoot him six times and leave him dying on the side of the road in handcuffs without even a gesture towards first aid should have *caused* Wetzel to wrestle with him. Indeed, had Wetzel only allowed Maurice Junior to flee, he would be alive today.   But he did not.   In this iteration of their brief, defendants have, appropriately, retreated from their claim.

Contrary to defendants' misapprehension, plaintiffs do not argue that defendant Grewal's ostensible agreement that law enforcement must improve in terms of bias, even if he was not talking about the State's "multiple law enforcement agencies" (Defendants' Brief at 8) rather than the NJSP with comparable

7

rates of racial disproportionality in the use of force, indicates anything helpful to the defendants, or even that it was genuine.  Indeed, the fact that defendant Grewal apparently failed to ensure sufficient measures were taken to correct this racially lopsided violence does not speak well for his intent and interest where, according to his former office, "The New Jersey Attorney General has the unique authority to issue statewide policy directives that apply to the New Jersey's 38,000 state, county, and local police officers and 1,000 state, county, and municipal prosecutors."

Thus, imbued with the power to address this genocide,[3] plaintiffs have, quite regrettably, credibly alleged that not only did defendants fail to stop it but, as set forth in plaintiffs' complaint, that they took affirmative measure to hide it.

The fact that plaintiffs do not engage in a further exegesis of defendants' factual exposition should not be taken to infer their adoption of any portion of it.

---

[3]The term genocide is used as defined in Article II of the Convention on the Prevention and Punishment of the Crime of Genocide.

8

**Argument**

**Supervisory Liability Is Sufficiently Pleaded And Present**

(Responding to Defendants' Point I)

As set forth in the accompanying sworn report of John Lamberth, Ph.D., using the defendants' own publicly available figures pertaining to the period of 2012 to 2016, relative to all others, a black person was more than three times more likely to have force used against him by the NJSP during that period.[4]

_____

[4]Although the Courts have not been uniform in concluding that an expert's report may be used on a motion to dismiss, we believe that where, as here, defendants have argued the reliability of data, and an analysis of its meaning is beyond the ken of ordinary persons, an expert's analysis is properly considered (see, Gelboim v Bank of America Corporation, 823 F3d 759, FN 20 [2nd Cir 2016] expert's probability analysis considered]; In Re: London Silver Fixing, Ltd., Antitrust Litigation, 213 F.Supp.3d 530, 563 [EDNY 2016] [experts' analyses are factual assertions at pleading stage]); Dover v British Airways PLC, 2014 WL 317845, *2 [EDNY 2014 unreported] [at certain level of particularity, statistical analysis not a conclusory assertion; it is factual allegation that the Court must credit]); In Re: The Mannkind Securities Actions, 835 F.Supp.2d 797, 821 [USDC CA 2011] [experts' reports attached to pleadings buttress plaintiffs'

The next period for which data is publicly available in this pre-discovery stage commences in October of 2020, five months after Maurice Junior was shot.  From that time, a black person was nearly six times – *six times* - more likely to have force used against him by the State Police than all others, and more than *eight* times more likely to have force used against him as opposed to a white person.[5]

The State defendants can hardly deny knowledge of this. Notwithstanding their repeated protests that the Force Report incorporated data from all New Jersey Police Departments statewide, our expert makes clear that "he used the data from the New Jersey State Police" in coming to his conclusions (Exhibit A, p 2).  In light of their assertions in their instant brief that racial disparities in law enforcement was a matter they closely monitored - and their prior papers are replete with such

---

contentions]).

[5]Erring on the side of conservatism, plaintiffs' complaint alleges the racial disparity in use of force by State Police is more than three times greater (Am. Comp. §§68, 88) and "three times" greater (*id.* §§ 69, 71).  It was unknown at the time of drafting that it appears to have grown to more nearly <u>six</u> times greater as against all others around the time Maurice Junior was shot - eight times greater as opposed to a white person.

contentions   as   well   -   knowledge   of   this   egregious disproportionality appears self-proclaimed.

Indeed,   in   their   previous   papers,   in   taking   issue   with plaintiffs'   assertion   that   defendant   Grewal,   in   a   public statement, conceded he did not "engage in rigorous oversight and analyses   of   the   State   Police's   actions,   training,   and   internal investigations in an effort to ensure that members of State Police do not engage in racially motivated policing" as he asserted, they said in response:

> Thus,   Plaintiffs'   assertion   in   the   Amended   Complaint
> that "Grewal has conceded that his office did not do
> this"   (i.e.,   monitor   and   analyze   uses   of   force
> particularly   in   relation   to   racial   statistics)   is
> inaccurate as to the New Jersey State Police, and in
> fact he stated the opposite from what Plaintiffs allege.
> (See   Am.   Compl.   ¶   77).   That   assertion   made   in   the
> Amended   Complaint   also   flies   in   the   face   of   reality
> because   the   Office   of   the   Attorney   General   in   fact
> <u>conducts   extensive   statistical   analysis   of   all   State</u>
> <u>Police   activity   as   it   relates   to   the   race   of   the</u>
> <u>subjects   of   that   activity — including   uses   of   force —</u>
> <u>and   publishes   detailed   reports   of   that   analysis   for</u>
> <u>anyone in the general public who wishes to review them.</u>[6]

(DB,[7] p 19 [footnote omitted] [emphasis added])

Thus,   with   the   State   defendants   making   no   claim   of   falsity with   respect   to   plaintiffs'   claims   of   racially   disparate

---

[6]The accuracy of this assertion is addressed below.

[7]References to "DB" are to defendants' prior brief in support of their motion (Docket No. 36-1).

treatment, if the State defendants are to be believed, they *knew* of the six or eight to one racial disparity in the use of force around the time of Maurice Junior's killing.  And they allowed it. Indeed, as set forth below, they hid it.

The State defendants attempt to step away from the findings in the Force Report which incorporated data from all New Jersey Police Departments and not just the NJSP.  But as set forth in the accompanying report of Dr. Lamberth, who segregated the NJSP data from the data in the Force Report:

> The odds ratio for the use of force data comparing Black vs non Black from 2012 to 2016 (from the Advanced Media) data is 3.32.  When I make the same comparison about 4 years later from the NJOAG data the odds ratio is 5.6. However, these data are confounded by the fact that included in the non-Black category are other minority groups. Therefore I decided to compute the odds ratio for Black vs, White. When I make that comparison the odds ratio is 8.1.

(Exhibit A, p 4)

It is against that factual backdrop that the State Defendants move to dismiss.

These defendants claim plaintiffs "merely pled accusations in the form of legal conclusions" (Defendants' Brief [87-1], p 7). But racially disproportionate use of force is not a legal conclusion; it is a mathematical or statistical conclusion, and here, a factual one.  Accepting *arguendo* that State Police were using force against blacks at a rate more than six or eight times

as against others in response to the same precipitating conduct, it is hard to comprehend how the State defendants can claim there are no "actual facts which show deficiencies" in their policies and practices. (*id.*).  The complaint does not allege a potentially anomalous event, or occasional mistakes.  It alleges facts and a pattern from statistics enmassed.

Defendants assert plaintiffs have not alleged a "policy, practice, or custom" which caused a Constitutional harm, or shown that defendants acquiesced to their subordinates' conduct (Defendants' Brief [87-1], p 19).  Setting aside for the moment that plaintiffs allege defendants actually facilitated their subordinates' conduct by hiding the fact of it.  Plaintiffs submit that sending out an armed contingent of Government workers knowing they will be going out and inflicting harm on citizens because of their race at an eight to one ratio as against white people sufficiently states a policy, practice, or custom, albeit a Constitutionally repugnant one.

Indeed, it is nearly impossible for plaintiffs to believe that by pleading a more than a three to one racial disparity in the use of force - but actually a six to eight to one disparity - the defendants could consider the plaintiffs to have not plead an actual fact which shows egregious deficiencies in their policies, practice, or customs.  Plaintiffs can only wonder what degree of

disproportionality defendants would find sufficient to suggest deficiencies in their policies, practice, or customs.   Twenty to one?  Thirty?

A disproportion of more than three to one, but apparently in actuality six or eight to one.  That's the actual fact alleged.

Morever, these defendants' arguments that their deliberate indifference to a custom or practice of systemic discrimination "is simply not plausible" (*id.*) because of the statutorily mandated oversight defendant Grewal's Office was required to conduct under the Law Enforcement Professional Standards Act of 2009 ("LEPSA") is a *non sequitur*.  It does, however, demonstrate their knowledge of the systemic discriminatory behavior plaintiffs have alleged, or their indifference to that knowledge unless they come forth to contest the disparity alleged which they have not done.  It does not extricate them from it.

Notwithstanding, defendants still claim "the Amended Complaint fails to plead any actual facts showing that Supervisory Defendants were aware of such a custom or practice and were deliberately indifferent to it" (Defendants' Brief, p 14 [87-1 p 20]).  But set aside the knowledge of racial disparity that they themselves appear to concede.  Plaintiffs' amended complaint quotes defendant Grewal as he is confronted with these facts in 2018 which he is now trying to elude (Am. Comp. §§78-85).

As the State defendants have pointed out in an earlier brief:

[T]here are two general ways that a supervisor can be held liable. *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), overruled on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042 (2015). First, a supervisor can be liable when with "deliberate indifference to the consequences," he establishes or maintains "a policy, practice, or custom which directly caused [a] constitutional harm." Id. (citing *A.M. Ex Rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).

The State defendants have also stated:

Second, a supervisor may be personally liable if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." Id. (internal citation and quotation marks omitted).

We believe both are present here.

In order to successfully show supervisory liability under based upon an alleged deficient policy, Plaintiffs need to show that a supervisor either establishes or maintains "a policy, practice, or custom which directly caused [a] constitutional harm." Id. at 316 (citing A.M. Ex Rel. J.M.K., 372 F.3d at 586).

(DB, p 10)

Here, the policy, practice and custom at the time of the decedent's death was to allow the State Police, armed and under color of law, to go out on the streets and highways of this State where they would administer force to black people at nearly six times the rate as against all others. And defendants appear to claim, they allowed this knowingly.

The State defendants, apparently claiming they were well versed in, or at least well-positioned to know of, their subordinate's unconstitutional conduct, nevertheless allowed their subordinates, armed and under color of law, to go forth in the community seven days a week, 365 days a year where, around the time of Maurice Junior's death, they would inflict force on black people more than six times more often as they would against all others and more than eight times more often than as against white people.

We believe this is far worse than an "acquiescence" to their subordinates' unconstitutional conduct.  And we believe plaintiffs have pleaded the State defendants' discriminatory intent, including but not limited to by alleging:

> 103.  Grewal and Callahan were intimately aware of the disparate use of force by New Jersey Police and acted with deliberate indifference towards resolving it. Indeed, these defendants took affirmative actions – delaying the release of reports or statistical data for instance – which fostered racial disparity in the NJSP's use of force.  Knowing that black people were the victims of the disparate treatment and failing to stop it, or the acts of these defendants, rises to the level of demonstrable racial animus.

> 104. Grewal and Callahan had knowledge of a racially motivated conspiracy within the State Police.

> 105. The three to one ratio of disparate use of force acknowledged by Grewal was based on multiple years of use of force data which worsened to eight to one as of the date complained of.

> 106. Grewal and Callahan's inaction was tacit or implied

conspiratorial agreement among each other and with the malefactor officers that continued to disproportionately use of force on black people, up to and including May 23, 2020, when Junior was killed by defendant Wetzel.

107. The shooting of Junior by Wetzel who knew, inter alia, he was unarmed, did not notify him he was under arrest, who was unable to comply with the command to "get the fuck out the car" while approximately twenty feet behind it was an overt act in furtherance of the conspiracy alleged.

108. Grewal and Callahan's acts and failures to act when they had information of racially disparate treatment and a duty to act constitute overt actions in furtherance of the conspiracy.

109. Grewal and Callahan's denials of, and conduct which hid, racially disparate use of force by NJSP constitute overt actions in furtherance of the conspiracy.

110. Grewal and Callahan's denials of, and conduct which hid, racially disparate use of force by NJSP was intended to, and did, prevent or diminish public outcry which would have required efforts to ensure that race-based brutality by the NJSP diminished or ceased, and constitute overt actions in furtherance of the conspiracy.

111. Grewal and Callahan failed to protect Junior by ensuring that appropriate safeguards were in place, sufficient training was given, and the law was being enforced to protect citizens of color against disparate or racially biased actions including, in this case, the use of deadly force.

112. The effect and/or purpose of this conspiracy was that black people were denied equal protection of the law and treated differently than white people when police elected to use force on civilians. In this instance, Junior was killed after being assaulted, and battered by defendant Wetzel. The conspiracy was the causal link to the harms complained of here.

* * *

* * *

117. The foregoing conduct of the State defendants gave license to, allowed, encouraged, contributed to, fostered or caused the racially disparate conduct of NJSP Officers in their use of force against black persons.

(Am. Comp.)

Intentional discrimination can be shown when a facially neutral law or policy is applied differently on the basis of race (Antonelli v New Jersey, 419 F.3d 267, 274 [3rd Cir. 2005]).

To be sure, discriminatory intent is not required.  "When a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm" (T.E. v Grindle, 599 F.3d 583, 591 [7th Cir. 2010]).

Indeed, "racial animus need not be an element in a § 1983 cause of action, nor is there a requirement of intentional conduct or any other particular state of mind as a prerequisite to recovery (Goodman v Lukens Steel Co., 777 F.2d 113, 135 [3rd Cir. 1985] [citation omitted], affirmed, 482 U.S. 656 [1987]).

"[A] 'person' is not the moving force [behind] the constitutional violation of a subordinate  unless that 'person' —

whether a natural one or a municipality — has exhibited deliberate indifference to the plight of the person deprived" (Sample v Diecks, 885 F.2d 1099, 1118 [3rd Cir. 1989] [citations and some internal quotations omitted]).

But it gets worse.

Here, there is not only evidence of defendants' acquiescence and indifference to racially disparate conduct in law enforcement by the State Police, there is evidence they hid it. There is irony to this in light of the fact that defendants' earlier brief goes on for several pages hailing their vigilance with respect to racial disparity issue (DB, pp 14-19).

According to the Sixth Periodic Report on Law Enforcement Professional Standards (State of New Jersey, Office of the State Comptroller, May 14, 2020):

> Since at least 2012, OLEPS has recommended to NJSP no less than 10 times that a more precise internal or external benchmark be developed. NJSP acknowledges that it would be preferable to use an external racial/ethnic benchmark, but has taken no steps to do so. The danger involved in using an internal benchmark is that is could permit discriminatory conduct to go undetected system-wide as long as that conduct occurs consistently within NJSP. That is clearly what the external benchmark required by the Consent Decree was designed to prevent. The absence of an external benchmark may undermine the integrity and reliability of the entire enterprise.

(*id.* at 14)

Defendants admit that:

> The Act also requires that OLEPS prepare and release a
> biannual report that "evaluates the Division of State
> Police's compliance with relevant performance standards
> and procedures and that is comparable" to the reports
> that were issued under the Consent Decree. N.J. Stat.
> Ann. 52:17B-229

(DB, p 16)

And yet, the Office of the New Jersey State Comptroller also

found:

> * * * The Act [LEPSA] requires OLEPS to issue bi-annual
> public reports showing aggregate statistics on NJSP
> traffic enforcement as well as aggregate data on the
> race and ethnicity of the civilians involved [N.J.S.A.
> 52:17B-235]. OLEPS is also required to issue bi-annual
> public reports that evaluate NJSP's compliance with
> relevant performance standards and procedures (Oversight
> Reports) [N.J.S.A. 52:17B-229]. OSC's review revealed
> that there is a significant delay in the end date of the
> data being analyzed and the date the report regarding
> that time period is made public.  For instance, OLEPS's
> Fourteenth Oversight Report, which was issued in
> February 2019, analyzed motor vehicle stop data for the
> time period January 1, 2016 through June 30, 2016.
> Similarly, OLEPS Fifteenth Aggregate Report of Traffic
> Enforcement Activities was issued in August 2018, but
> reviewed and analyzed data for the period January 2016
> to June 2016.  The delays are worsening.  As of the
> issuance of this report in May of 2020, OLEPS has not
> issued its Fifteenth Oversight Report addressing motor
> vehicle stops during the second half of 2016.
>
> OLEPS provided OSC with several reasons for these
> delays.  OLEPS stated that the delay is attributable, in
> part, to staffing issues and other projects assigned to
> OLEPS by the OAG.  OLEPS also advised that the reviews
> of draft reports by NJSP and the OAG cause further
> delays.  OLEPS explained that the fieldwork and analysis
> for the Fifteenth through Nineteenth Oversight Reports,
> which would cover motor vehicle enforcement activity
> through the end of 2018, are complete.  The reports,

however, are <u>still in various stages of review</u> and not
yet ready for publication.

(*Id.*, p 22 [emphasis added])

We submit this paints a very different picture than that
painted by defendants. This Court may wish to compare the New
Jersey Comptroller's statements against the defendants and may
weigh which it is inclined to credit.

Indeed, in their initial motion to dismiss before this Court,
defendants stated, *inter alia*:

> * * * State statutory law actually mandates that an
> office within the Office of the Attorney General, OLEPS,
> <u>engage in rigorous oversight and analyses of the State
> Police's actions, training, and internal investigations
> in an effort to ensure that members of State Police do
> not engage in racially motivated policing.</u> As a result,
> Plaintiffs' claims based on the theory that Defendants
> fail to supervise and train the State Police in a manner
> that is constitutionally sufficient should be dismissed
> as well.

(Docket # 19-1, Page 24 of 28 [emphasis added])

It appears defendants' oversight of State Police actions may
not be as "rigorous" as defendants would have this Court believe.

If the statements in the Comptroller's report are true, this
merely demonstrates that defendant Grewal's Office, the State's
highest Law enforcement authority, simply broke the law.

Indeed, we believe that stalling the public issuance of these
reports by the defendants, as identified by the Comptroller's
report, itself demonstrates additional wrongful conduct in hiding

this deplorable data.   This is impermissible (<u>White v Williams</u>, 179 F.Supp.2d 405, 419 [NJDC 2002]).   Although unknown to plaintiffs at the time of drawing their second amended complaint, this gave rise to another factual basis for additional amendment granted.

**The Supervisory Defendants Are Not Entitled To Qualified Immunity**

(Responding to Defendants' Point II)

"The doctrine of qualified immunity gives officials breathing room to make reasonable but mistaken judgments about open legal questions" (<u>Ziglar v. Abassi</u>, ___ US ___, 137 S.Ct. 1843, 1866 [2017] [quoting <u>Aschcroft v. al-Kidd</u>, 563 U.S. 731, 743 [2011]). This results in officials receiving shield from suit unless "[1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." (<u>Terebesi v Torreso</u>, 764 F3d 217, 230 [2nd Cir 2014] [internal quotation and citation omitted]). A right is clearly established when its contours… are sufficiently clear that, at the time of the challenged conduct, "every reasonable official would have understood that what he is doing violates that right" (<u>Aschcroft</u>, 563 U.S. at 741).

However, "while government officials have the right, for well-developed policy reasons, to raise and immediately appeal the

qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case (Wong v. U.S., 373 F.3d 952, 957 (9th Circuit 2004 [internal quotations omitted]) Further, "a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds (Alvarado v. Litscher, 267 F.3d 648, 652 [7th Circuit 2001] [citing Jacobs v. City of Chicago, 215 F.3d 758, 765 n.3 [7th Cir. 2000]).

Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: "The plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity" (*id.*). As noted in the Jacobs' concurrence, "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal" (*id.* at 775 (Easterbrook, J., concurring]. [W]hen defendants do assert immunity it is essential to consider facts in addition to those in the complaint" (*id.*).

As an initial matter, the State defendants seem to misapprehend plaintiffs' pleadings by asserting that plaintiffs are suggesting what policy the Attorney General's Office or New Jersey State Police needed to have implemented to address the NJSP's discriminatory use of force. But plaintiffs do not plead that there is an established right to the implementation of a particular type of policy.

On the contrary, plaintiffs pled that the failure of the State defendants to address the disparate use of force in an effective way, which they were aware of from the New Jersey Force Report and from the statistical data collected by OLEP, which defendants conceded is required by law, constitutes acquiescence, deliberate indifference, and conspiracy with the bad actors. Accordingly, the NJSP's disparate use of force against Blacks compared to white citizens despite less provocation is and was on May 23, 2020, the *de facto* policy, custom and practice in place in violation of the Fourteenth Amendment.

But it gets worse.  Knowing their subordinates were engaging in force disproportionately based upon skin color, defendants authorized State funds to pay for their subordinates while they engaged in such activities.  They permitted their subordinates go commence "work" each day knowing their activities would include force used disproportionately based upon skin color. And more. They acted to conceal such activities to avoid the public outcry which would be warranted upon exposure.  Their actions - or inactions - were more than acquiescence.  They were enabling.

In 2018, when confronted with the statistics that Black people were at least three times more likely to have force used against them, despite less provocation, then Attorney General Grewal acknowledged "You've obviously highlighted shortcomings in

the system, and we're committed to fixing whatever shortcomings there are to ensure we have the best system here in New Jersey to collect this information and review it."

This did not happen.

Aside from the death of Junior almost two years after Grewal conceded the system was broken, the Office of the New Jersey Comptroller - just two weeks before Junior's killing – reported it recommended to the NJSP no less than 10 times that a more precise internal or external racial/ethnic benchmark was needed to prevent discriminatory conduct within the NJSP from going undetected system-wide (Sixth Periodic Report on Law Enforcement Professional Standards [State of New Jersey, Office of the State Comptroller, May 14, 2020], p 14).

A government official can be found liable under Section 1983 if they are personally involved with the alleged constitutional violations (Rode v. Dellarciprete, 845 F.2d 1195, 1207 [3d Cir. 1988]). A defendant's personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence (id.).

Grewal and Callahan were deliberately indifferent to the racially disparate conduct of the NJSP. Even worse, as discussed in the Comptroller's report supra they have apparently hidden the data.

The State of New Jersey has a well-established history of issues with racial profiling and disparate treatment of people of color (*see,* White, 179 F.Supp.2d at 411-416; State v. Soto, 324 N.J.Super. 66, 84, 734 A.2d 350 (Law Div.1996).   The breadth of the illegality resulted in a federal consent decree (United States v. State of New Jersey, 3:99-cv-05970-MLC-JJH, ECF no. 5 [D.N.J. December 29, 1999]). It is shocking that defendants would take the position that there was no "controlling authority" or "robust consensus of cases of pervasive authority" and its reliance on Taylor v. Barkes (575 U.S. 822 [2015]) is misplaced.   But let them declare outright what is implicit in their position: There is no clearly established law prohibiting our Government from subjecting its citizens to force and harm disproportionately based upon the color of their skin.

Taylor dealt with the question of whether the plaintiff had an established right to the proper implementation of adequate suicide prevention protocols. Here, plaintiffs have not pled nor or are they suggesting that a particular policy be implemented. Plaintiffs allege that defendants' failure to effectively address the disparity in the use of force by NJSP against Black people, which defendant Grewal in his own words acknowledged reflected a "broken system" and which was further supported by statistical data collected by OLEP constitutes a *de facto* policy, custom or

practice that violates the Fourteenth Amendment.

Similarly, defendants' reliance on Beck v. City of Pittsburgh (89 F.3d 966, 967 [3rd Cir. 1996]) is misplaced. In fact, by parity of reasoning, it supports plaintiffs' position that Qualified Immunity should be denied.

In Beck the Court held that the question of whether the policy makers knew about and acquiesced to a custom tolerating tacit use of excessive force by police was a question for the jury.

Here, plaintiffs pled that the policy makers were aware of the disparate use of force by NJSP against Black people supported by data they acknowledged was accurate and that OLEP was required to collect. This acquiescence as pled constituted a custom tolerating the disparate use of force against Black people, which should be a question for a jury, not decided at the pleading stage.

The right to be free from disparate treatment by police based on race is clearly established and where proven amounts to a violation of the Fourteenth Amendment (see, Whren v. United States, 517 U.S. 806, 813 [1996]["The Constitution prohibits selective enforcement of the law based on considerations such as race"]; Illinois v. Wardlow, 528 U.S. 119, 133 n.10 [2000][Discussing then New Jersey Attorney General's pronouncement

minority motorists have been treated differently by NJSP than non-minority motorists during traffic stops on the NJ Turnpike. The problem of disparate treatment real, not imagined]; Martinez v. Vill of Mount Prospect, 92 F.Supp.2d 780, 782 [N.D.Ill.2000] [Racial profiling of any kind is anathema to system because it eviscerates the core integrity necessary to operate that system in our diverse democracy])

Nevertheless:

> Some things are so obviously unlawful that they don't require detailed explanation and sometimes the most obviously unlawful things happen so rarely that a case on point is itself an unusual thing. Indeed, it would be remarkable if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt.

(Dean for and on Behalf of Harkness v. McKinney, 976 F.3d 407, 418 4th Cir. 2020] [citing Browder v. City of Albuquerque, 787 F.3d 1076, at 1082-83 [10th Cir. 2015]); see also, Hope v. Pelzer, 536 U.S. 730, 741 [2002] [cases involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established])

Accordingly, public officials "can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was wrongful" (Williamson v. Stirling, 912 F.3d 154, 187 [4th Cir. 2018]).

Here, plaintiffs plausibly pled that State defendants' acquiescence, enabling conduct, and deliberate indifference to the

disproportionality in the use of force against black people compared to other citizens constituted a *de facto* policy which violated the Fourteenth Amendment.

Indeed, it was clearly established as of May 23, 2020, that Grewal and Callahan as policy makers could not be deliberately indifferent to the starkly disparate use of force on Black people by NJSP in their charge, especially when it was publicly acknowledged by Grewal and the statistics were available through OLEP. Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3rd Cir 2004); Cacciatore v. City of Phila*.,* 2005 WL 2139876, *1 - *3 [EDNY 2005] [unreported]).  This deliberate indifference was the moving force behind NJSP officers disparate use of force which is the constitutional deprivation that Junior sustained. If the policy makers are ignoring statistical data that reveals disparate use of force against Blacks - and even hiding it - there is no reasonable deterrence that could prevent the widespread custom.

No reasonable official would have thought acquiescence to NJSP officers disparate use of force against Black people at a ratio of at least 3 to 1 as of 2016 (based on the data from the NJ Force Report) and up to 8 to 1 as against white people around the time of Maurice Junior's shooting (based on the most recent publicly available data provided from the NJAG use of force portal) was lawful.

Therefore, State defendants request for qualified immunity should be denied.

### Plaintiffs Have Sufficiently Pled § 1985 & § 1986 Claims

(Responding to Defendants' Point III)

Defendants appear to have intentionally misstated the standard to overcome dismissal of a § 1985 (3) cause of action at the pleading stage. Defendants replace the word "allege" with "show" and then place the open quote right after "show" before listing the first element of a 1985 (3) cause of action in citing Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997) (Defendants' Brief at 28). The Court in Lake correctly states under 1985 jurisprudence that plaintiff must *allege* not *show* the elements of 1985 to survive a 12 (b)(6) motion.  Show would imply a requirement to prove, presumably through evidence obtained during discovery. This is not a Rule 56 motion.

Defendants also insert in their brief a quote lifted from a §1983 Conspiracy case[8] Laboalokie v. Capital Area Intermediate Unit, 926 F.Supp. 503, 508-09 (M.D. Pa. 1996)(quoting Loftus v.

---

[8] "Only allegations of conspiracy which are particularized such as those addressing the period of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient"

SEPTA, 843 F.Supp. 981, 986-87 (E.D.Pa. 1994)) seeming to suggest that the quote set forth the standard for alleging a §1985 Conspiracy (Defendants' Brief at 29). This is not what that Court articulated. If defendants sought to analogize a 1983 Conspiracy with a 1985 Conspiracy, they should have done that. Insertion of the court's pronouncement of the elements of a Conspiracy in a 1983 action into a brief seeking dismissal of a 1985 (3) cause of action without announcement of its origin and analogizing its application is improper.

Additionally, defendants misstate the status of Third Circuit law on the issue of whether two members of the same governmental agency can be said to "conspire" under section 1985 as unresolved. In fact, the case defendants rely on to make this inaccurate pronouncement spends two pages discussing conspiracy and the Court held:

> neither considerations of policy nor force of precedent require adherence to the defendants' stance [theory that officers and directors of a single corporation are immune to suit under 1985 (3)] we do not follow the line of cases adopting the rule that concerted action among corporate officers and directors cannot constitute a conspiracy under 1985 (3).

Novotny v. Great American Federal Savings & Loan Association, 584 F.2d 1235, 1256 - 1260 (3d Cir. 1978) (en banc), vacated on other grounds, 442 U.S. 366 (1979)

In at least two instances within this District the Court has found civil rights conspiracies under § 1985 for racially

discriminatory conduct. <u>Mitchell v. Fuentes</u>, 2013 WL 2253585 (D.N.J. 2013) (not published); <u>White v. Williams</u>, 179 F. Supp. 2d 405, 421 (D.N.J. 2002)

<u>Sufficiency of Pleadings</u>

It is ineluctable that plaintiffs have sufficiently pled § 1985 and § 1986 claims. The factual underpinnings for plaintiffs § 1983 Supervisory Liability claim, *Ante*, at 15 - 16 form the basis for the plausibility of plaintiffs § 1985 and § 1986 claims. Rather than reiterate the paragraphs word for word plaintiffs refer to ¶ 103 - ¶119 of the Third Amended Complaint in opposition of defendants' untenable position that plaintiffs have insufficiently pled the aforementioned causes of actions. Citing colorable claims against the State defendants, plaintiffs should have the opportunity to come forward with evidence to develop these claims. Id at 422

<u>State Defendants Are Not Entitled to Qualified Immunity</u>

Defendants' argument for entitlement to Qualified Immunity on the § 1985 claim appears to teeter on a linguistic slight of hand. Defendants state "two or more members of an executive department of the government <u>may not even</u> be capable of forming a conspiracy under 41 (sic) U.S.C. § 1985(3)" See <u>Ziglar v. Abbasi</u>, 137 S. Ct. 1843, 1867–1869 (2017)" (Defendants' Brief at 31)

[Docket 87-1, 37][emphasis added]).  But "may not," expressive of possibility, is different from "can not," and the Supreme Court explicitly left that issue undecided: "Nothing in this opinion should be interpreted as either approving or disapproving the intracorporate-conspiracy doctrine's application in the context of an alleged § 1985(3) violation) (Ziglar, supra at 1868).

Nevertheless, the matter remains decided, at least in this Circuit:

> [S]ince neither considerations of policy nor force of precedent require adherence to the defendants' stance, we do not follow the line of cases adopting the rule that concerted action among corporate officers and directors cannot constitute a conspiracy under s 1985(3).

Novotny v. Great American Federal Sav. and Loan Ass'n, 584 F.2d 1235, 1259 [3rd Cir.]; reversed on other grounds, 442 U.S. 366 [1978])

Nevertheless, this case tracks the relevant ratio decidendi in Novotny which found:

> As we read Novotny's complaint, however, it does not allege that the corporate entity, GAF, conspired with its officers and directors to his detriment. In defining his cause of action under s 1985(3), Novotny alleges that his termination was accomplished "by the individual defendants in violation of" s 1985(3).118 There is thus no occasion to evaluate the force of the proposition that a corporation cannot conspire with itself. Rather, the sole issue before us, so far as the conspiracy element is concerned, is whether concerted action by officers and employees of a corporation, with the object of violating a federal statute, can be the basis of a s 1985(3) complaint.

(Novotny, supra at 1257-1258)

While in Ziglar, the Supreme Court granted Qualified Immunity because of the murky status among the Courts of Appeals on whether the intra-corporate conspiracy doctrine applies to civil rights conspiracies, here, the State defendants are not sued in their official capacity. "Rather, the sole issue before us, so far as the conspiracy element is concerned, is whether concerted action by officers and employees of a corporation, with the object of violating a federal statute, can be the basis of a s 1985(3) complaint."

The law in this Circuit is "yes."

Here, two individuals conspired to violate the equal protection rights of Black people through their deliberate indifference to the disparate use of force against them compared to whites.

Finally, the history of racial profiling in the State of New Jersey, the State's subjugation to a Department of Justice consent decree in the 1990's and the passage of LEPSA to combat the exact type of racial discriminatory conduct complained of, make it impossible for State defendants to claim lack of notice of clearly established law.

Grewal and Callahan are not entitled to Qualified Immunity for the aforementioned reasons and those interposed in Point II of this brief.

**Conclusion**

For the reasons set forth above, it is respectfully submitted that defendants' motion should be denied in its entirety.

Dated: White Plains, New York
       March 7, 2022

The Wiesner Law Firm, P.C.

BY: /s/ Neal Wiesner
    _____
    Neal Wiesner
    34 East 23rd Street – 6th Floor
    New York, New York 10010
    (212) 732-2225
    nwiesner@wiesnerfirm.com

The Wagstaff Firm, P.C.

By: /s/ William O. Wagstaff III
    _____
    William O. Wagstaff III
    75 South Broadway – Suite 400
    White Plains, New York 10601
    (914) 226-3300
    William@Wagstaff.Legal